First case call for oral argument is Roy v. Roy. Counsel. Mr. Lee. There's a number of issues. The first factor that the court is supposed to consider is the ability of the parents to cooperate effectively and consistently in matters that directly affect the joint parenting of the child. Case law, facts add up. I cited In Re Marriage Drummond that cites that since joint custody requires extensive contact and intensive communication, it cannot work between belligerent parents. Statutory prerequisites evidence of intent that joint custody only be awarded where circumstances indicate that the parents are willing to cooperate in the upbringing of their children. The court said that testimony presented at the trial indicated that the parties were unwilling to cooperate and quite convicted towards each other. And in that case, the court reversed the award of joint custody and ordered that sole custody be awarded to the mother. Likewise, in Re Marriage of Seitzinger, joint custody should be awarded only where the evidence indicates the parents are willing to cooperate in the upbringing of their child. This court has set aside joint custody orders where the evidence showed the parents had too much animosity toward each other to be able to cooperate. And again, the cited case of Cocoa v. Holt, the court said that the parties here have not displayed a capacity to cooperate effectively regarding their daughter's upbringing. The petitioner and the respondent have such a history of disagreement that imposing joint custody arrangement even where it would not be in the best interest of the child. Here, both parties, one thing that they agreed upon is that they cannot communicate on anything, especially matters involving this minor child. We have the testimony of the guardian ad litem, Elaine Machine, who said the parties can't get along, can't talk about anything with regard to the child. Sole custody is the only way this can really work for the child. April, April Roy, the mother, should have sole custody. And there is animosity here. To understand this, you have to look at the entire background here. This daughter, this child, was sexually molested by her seven-year-old cousin, by the father's nephew. That cannot be denied. We had a child taken to Children's Hospital where she spoke with a social worker. Social worker wrote her report that was discussed in testimony. The social worker indicated that the child knew the detail about the sexual abuse that this 11-year-old cousin performed on this girl, and that she seemed very, very good in her ability to relate what happened, that she showed signs consistent with signs of abuse, and that there was concern that the father had not taken adequate measures to protect this child. DCFS investigated this matter and made a determination that this child was abused or neglected, and they indicated the father for failure to provide adequate supervision. Now, what is a primary obligation? I would submit to you that the primary obligation is to protect your child from harm. The evidence shows that since early 2010, the mother, April Roy, has done everything in her power to try to protect this child, while at the same time, the father and his family have worked against that obligation. When the mother first heard that there was some indication of improper conduct on the part of this 11-year-old predator in early 2010, she sat down with the father and said, Look, we know that there's problems with aging, and we can't allow this to go on. We've got to be careful. We can't allow any further possibility of this happening again. And the father said, Well, I'll find the right time to mention it to him. Then in June 2010, boom, that's when it comes out that this 11-year-old has been doing more to this 4-year-old than what they initially thought, that he had been sexually abusing this child. What does the mother do? She again tells the father, Look, we've got to do something. This cannot be continued. She goes to work that night as a police dispatcher, talks to law enforcement friends of hers, and they say, Well, you ought to go get an order of protection. She goes the next morning, gets an order of protection. That afternoon, after talking with the daughter and finding that the abuse is worse than she thought, she took the child to Children's Hospital. She did everything to try to protect this child. She kept stressing to her husband, We can't allow any contact. November 2012, she finds out that the father did allow his sister to take the child back to the house of the abuser. Finally, June 5, 2013, she obtains an order, an agreed-upon order, which says, Fathers shall allow no contact between the daughter on one side and the nephew, nephew's mother, nephew's grandmother on the other side. No contact at all. Finally, April Roy thought she had something with teeth in it and felt relieved. It only took three months for Mr. Roy to violate that order. And that's when she finally says, I discussed it with her. We ought to get a guardian ad litem to help out with this matter. Now, at the same time, the evidence shows that the father had accused the child of lying, that the father has repeatedly told the mother that she's blowing everything out of proportion, that the father did allow contact to continue between the child and the abuser in November, and at first lied about it, but then when the mother said, Look, I talked to your mom, and she said that your sister took the child back home to confront her abuser again. And then he finally admitted, Well, okay. Yeah, that happened. He violated court orders saying there should be no contact. During all this period of time, it's the child who has suffered. She was abused, and then she is brought into contact with this abuser even afterwards. And there's testimony that this child would act out. She would go into rages. She would pull her hair. She would bite herself. Two separate times she had to go into counseling. And also tell him there is nothing to show that anything on the father's side, anyone on the father's side did anything to try to do anything about this. Incredible as it is, this mother on June 10, 2013, I'm sorry, June 10, 2010, went to the search court and got an emergency order of protection whose sole purpose was to keep this 11-year-old molester away from her 4-year-old daughter. Sole purpose, protect her daughter. Three weeks later, when she shows up for an extension of the order of protection, she's by herself. She doesn't think she needs a lawyer. Here comes the 11-year-old AJ with his mother, with his grandmother, with a lawyer to fight this order of protection. They take the side of the molester against the 4-year-old. And because they had an attorney who successfully argued hearsay objections, the order of protection was thrown out on hearsay grounds. And even after that, in November 2012, when April tells Joseph, well, you know, it's Veteran's Day weekend. Why don't you take April for the day? And he does, and then he's busy, and he tells his sister, hey, why don't you come pick up my daughter and spend the day with her? She takes her right back to her house where the daughter, again, is confronted with her abuser. Consistently, consistently, April is the only person who has steadfast, done everything in her power to protect her child. Consider the concerns expressed by the guardian in her testimony. She said that the father just doesn't get it. He believed that the things happened, but on the other hand, he kind of didn't believe that it happened. He wasn't understanding how his thoughts were affecting his child. He was gung-ho that his child needed to know his family. And to this day, what I find incredible, when under cross-examination of the father, he referred to his nephew as an alleged perpetrator. And I asked my fellow, what do you mean, alleged perpetrator? And his quote was, since I wasn't there seeing it, I still have that wonder. Did it happen? Now, again, this is after the report from Children's Hospital. This is after the investigation by DCFS. This is after the father initially called his daughter a liar. This is after the father repeatedly accused my clients of blowing this out of proportion and to this day he still questions, well, I'm not so sure it really happened. This is the background on the inability of this mother and father to communicate. The issue should be resolved that the joint custody order be reversed and that sole custody be awarded to the mother of the boy. It is also our position that the award of unsupervised visitation to the father is against the manifest way of the evidence and an abuse of discretion. Largely, initially, for the same reasons that I went into on the issue of custody. He just doesn't get it. He has repeatedly, the father has repeatedly made bad decisions. I don't know if it's intentional. I don't know if it's just not thinking. But it's the child here that we have to be concerned about. He fails to understand the gravity of the situation. To this day, he even questions whether or not the abuse occurred. I don't think there was any doubt in the mind of the guardian ad litem that abuse did occur. And he accuses April again of blowing all of this out of proportion. I have to ask this question. If a mother of a 4-year-old daughter finds out that an 11-year-old nephew or 11-year-old cousin of the daughter has sexually abused her daughter, how can she blow that out of proportion? What possible thing could a mother do to blow that out of proportion? As an aside, I'm involved oftentimes in juvenile court. I get appointed through the Public Defender's Office to represent parents who are charged with abuse and neglect. And I've seen situations where a mother is criticized because she didn't take action. Here, she's done everything she can. In his brief, in his reply, or in his equity brief, when we talk about the incident of September 6, 2013, the phone call to his sister, Jocelyn, he refers to that as, quote, just an innocent thank-you call, unquote. Well, first off, I don't think violating a court order is ever innocent. But again, you have to consider this in the context. Every time that this child was damaged in this case, the sister, Jocelyn, was involved. When this child was initially sexually abused in early 2010, it was at the home of Jocelyn when this 11-year-old was there. When the sexual abuse got worse in the middle of 2010, in June 2010, the testimony was that the father was there, the girl was there, her 11-year-old cousin was there, and Jocelyn was there. When they showed up in court for extension of the order of protection, it was Jocelyn that was standing next to AJ to get the order of protection thrown out. In November 2012, when Mr. Roy had his daughter for the day and decided to let Jocelyn take the daughter, and Jocelyn took the daughter back to the house where her abuser was, it was Jocelyn that did that. So when my client finds out, after getting this order, saying her daughter has had no contact with AJ, Jocelyn, or Jacqueline, that he did have contact, it's not that innocent. It's not that innocent. And that's when she says, look, I'm not going to let you have her daughter. And we're going to get a guardian ad litem to sort this out. I have suspect about his rendition of what happened on September 6, 2013. He said that it was a thank you call because he couldn't afford to get six FLAGS tickets, and his sister provided those. And his quote was, well, you know, I'm broke, didn't have the money, I'm not working, you know, unquote. Well, Petitioners Exhibits 10 and 11 are his pay stops for about a three-year period, and Exhibit 11 is the demonstrative evidence, demonstrative chart showing how many hours and all that that he worked part-time. Thank you. Counsel? Your Honor, good morning. It's our position that the trial court will not abuse its discretion in awarding joint custody and unsupervised visitation. I'd like to address what Mr. Rice called a lack of communication on parts of the party. I believe the record of the trial reflects that the lack of communication can come from one person. The testimony of my client is that he has tried and tried to communicate with the mother, but the mother will not return phone calls. She won't return texts. She basically, you know, will not speak to him at all. He testified that it's like talking to a fictitious person. She'll leave a voice note, no phone call back. All the case law cited talks about when there's an inability for both parties to cooperate, to communicate, facilitate a good relationship with each other. I say in this case there's only one party that is not willing to communicate with the other party, and that is Mrs. Roy will not communicate with the father of the child, Mr. Roy, my client. I don't think she should be rewarded for saying I'm not going to talk to the father. If I don't communicate with him, maybe I can get sole custody, and we believe that is what she's doing. She had no problem communicating with the father for the most part until this phone call in June of 2013. What Mr. Rice also fails to talk about is, you know, the time frame from June 2010, these horrible acts occurred up until that phone call of September of 2013. The parties testified to how often Mrs. Roy would leave the child, Riley, with Mr. Roy. She would go for weekends at a time to visit her boyfriend. She had no problem leaving Riley with my client, Mr. Roy. This is after these incidents occurred in June. It wasn't until that phone call when she decided I can't communicate with him, I can't talk to him, I should seek sole custody. Again, there were times when she would leave for weeks at a time. Again, the kid was in the sole care custody control of my client. It wasn't an issue. Mr. Rice talks about an incident in September of 2012 where Jocelyn, my client's sister, was able to take Riley, the child, to her home. My client testified that there was an agreement between the parties that Riley could go with Jocelyn. My client had no control over where Jocelyn took the kid after the kid went with Jocelyn. He had no idea that she would take him to the home where the perpetrator, his nephew, would be. Where Jocelyn didn't tell him, yeah, Joe, I'm going to my house, AJ's going to be there, what's your opinion? He didn't know about it. Plus, after that date, after April, Mrs. Roy found out, she didn't cut off communication. She didn't say, Mr. Roy, you can't see your kid. Again, she allowed him to have unsupervised visitation, or parenting time is what it's called now, for another year until that phone call in September of 2013. During the course of the trial, Mr. Roy did testify that he allowed the phone call, that he made a mistake. He testified that he didn't know that it was in violation of the order, but when he found out, he did admit that it was a mistake. The brief says, or our brief says that it was an innocent phone call, a thank you. It was a thank you phone call. It was to Jocelyn. It was thanking him for the Six Flags tickets. It was over the speakerphone. Mr. Roy did not allow contact between Riley and the nephew. Since June 2010, he hasn't directly allowed contact between Riley and the nephew. He's done what he can to keep Riley away from him. They also fail, or Mr. Rice also fails to mention about how involved Mr. Roy was in young Riley's life prior to September of 2013. He testified how he would bathe her, he would take her to the park, he would take her to school. There's a time frame when Mrs. Roy was working that my client was the primary caregiver for the child. It's our opinion that she was using this phone call, albeit in violation of a court order, to try to get sole custody of the child. To try to basically excommunicate, to eliminate Mr. Roy from her, or Mr. Roy from Riley's life. Again, the incidents, they're horrible. You've heard Mr. Rice say that my client is unwilling to accept them, or that he needs to be black and white. He wasn't there when, or he was there when it occurred, but he wasn't outside in the pool. He wasn't able to go to Children's Hospital when April wouldn't tell him where she was going. So he didn't have firsthand knowledge of what occurred. Maybe he's hard-headed, maybe he doesn't want to believe it did occur. But he's accepted that something did occur, and that's why he has kept Riley from his nephew since June of 2010. Clearly, it is in Riley's best interest that both parents are involved. We've seen a pattern from Mrs. Roy that she's going to try to alienate my client, Mr. Roy, from Riley. It's occurred since September of 2013, and it will continue to occur unless this case, unless this court upholds the ruling of the trial court. In our brief, we cited the Doby case. It says that the court is in a superior position to observe and evaluate, witness, and weigh credibility. That's exactly what the court did in this case. She took all the evidence. She weighed it. She looked at the testimony of both clients. She took into, you know, into thought what the guardian lied and said in her two reports to the court and in her oral report at the hearing. She took all that. She weighed it. She said this child needs both parents in her life. If the parties aren't awarded joint custody, my client would not be involved at all in this child's life. And that's why we believe that she ruled for joint custody. She says in her judgment dissolution of marriage that the trial court stated she took the serious issues raised by April, the phone call, into consideration when making her ruling. So she looked at the incident of June 2010. She looked at the subsequent phone call in September of 2013. She factored it all in, and she decided that joint custody is in the best interest. As far as unsupervised visitation, we rely basically on our same argument. From June 2010 through September 2013, when the phone call occurred, Mrs. Roy allowed Mr. Roy to have Riley in his sole care and custody without any restrictions. Okay, this is after the incident of June 2010. This is after the incident of September 2012. She had no problem. It is a thank-you phone call with Jocelyn, with the child, that basically pushed her over the edge. Now, the court would like to restrict visitation with Jocelyn. My client had no problem with it because it appears that Mr. Rice is saying Jocelyn is there at every event. It appears that Jocelyn may be the catalyst to connect AJ with Riley, not my client. Like I said, from June 2010 through today, Mr. Klein has not directly placed Riley in the same area with her cousin and nephew. Again, there's obligations in his brief that the child is shutting down after she comes home with visitation with the father. Again, that's the testimony of Mrs. Roy. We don't know why the kid's shutting down. We don't know if the kid's acting out because she doesn't want to be with her dad. That should not be a reason for supervised visitation. The law says that visitation should be restricted if visitation would seriously endanger the minor child. There's no evidence that her health, mental, physical, is seriously endangered by having unsupervised visitation with my client. The guardian didn't mention anything about the child being seriously endangered at all. And again, the trial court, she looked at all the evidence, and she decided that unsupervised visitation with joint custody was the way to go. It is in the best interest of the partner's minor child. We would respectfully ask that you uphold that ruling. As far as the guardian-in-abiding fees, again, we do not believe that the judge abused her discretion in awarding or ordering Mrs. Roy to pay for all the fees. It's our position that the guardian-in-abiding was never necessary in this case. Again, we go back to that same timeframe from June of 2010 through September 2013 when she sought out a guardian-in-abiding. She allowed Riley to be with my client with no restrictions, but then once this phone call occurred, that's when she ran to court seeking a guardian-in-abiding. She did follow a rule to show cause. And again, it is in violation of the order, and my client admits he did violate the order. He didn't know he was doing it, but he did violate it. Without that violation, a guardian-in-abiding would have never been ordered. If she would have just simply made a phone call to my client and said, look, you violated the order. Why didn't you have Riley speak with Joshua? You're not supposed to do this. Maybe they could have discussed it. But it's the one phone call that seems to be the catalyst for seeking sole custody, for seeking supervised visitation. And again, I'm not saying that it was a mistake, but it was a phone call between us on speakerphone, a thank you phone call for a matter of seconds between Riley and her aunt. Again, there was no contact between Riley and AJ. It would be a different story if my client allowed his daughter to be around his nephew, but that didn't occur here. So that's why we asked the court to uphold that ruling that Mrs. Roy should be responsible for all guardian-in-abiding fees, because she is the reason the guardian-in-abiding was necessary. As far as the award of retroactive support, again, the judge took all the evidence that she decided that there should be no award of retroactive support. That's based upon other rulings, and her judgment of dissolution of marriage included that Mrs. Roy was awarded the only marital home. She was awarded a laundry list of marital property, $20,000 from Mr. Roy's 401k. So she had the capability to pay her attorney's fees. So we asked that the court uphold that ruling as it was not an abuse of discretion. Again, what cannot be lost upon this court is that the child needs both of her and her parents in her life. And if sole custody is awarded to Mrs. Roy, that's simply not going to happen. My client cannot change what occurred in June 2010. At first, he just didn't want to believe it. But now he's probably come to the grips that something did happen, that he needs to protect his daughter. And since that day, he has not allowed his daughter to be in contact with the perpetrator. Again, he should not be removed from his child's life because over three years after that incident, he violated a court order where he allowed his daughter to speak up and to thank his aunt for giving her six wax tickets. Again, this is simply, if it's not fair to the child, it's not fair to my client. And we hope that you take that into serious consideration. Again, he was very involved with the child's life, and then all of a sudden, he was out of the child's life. He went in September of 2013 to see his daughter every other weekend. And once a week during the week, he had no time with his daughter. It took the guardian in Lydon and through negotiations with the attorneys for him to see his daughter in April of that year. He had supervised visitation for three hours, random weekends. And he's lost enough time with his daughter. And we just hope that he's able to continue with joint custody, continue to be allowed to be in his daughter's life, and foster that relationship that all children should have with their parents. Again, he can't change the past, but he's moving forward. And I think he is properly trying to have a good relationship with his daughter, and he's trying to actually foster and facilitate a good relationship between her mother and the daughter, something that she's unwilling to do. And I think if sole custody is awarded to Mr. Riley, my client will not see his daughter. He actually stated, if I don't get joint custody, I'll never see my daughter again. And that's his greatest commitment. Thank you. Thank you, Counsel. Counsel? Once again, Mr. Riley wants to place everything on the blame of April. The argument was made, we don't know why the child is shutting down. That is not true. This is the testimony of the guardian in Lydon, who is independent in this matter, doesn't have one side or the other, and is able to fully investigate the whole thing. She said, regarding the unsupervised visits that started recently, Riley's behavior has not been good after unsupervised visits with her father. She has thrown water on her mother and has been disrespectful following visits with Joseph. Then she goes on to say this, I know that he, that's being Joe, the father, says things to her, Riley, because he's quoted himself saying he says things that don't further the relationship with her mom, and I'm afraid that if he says anything negative to her, she's going to act out, and it sounds like that's what she's been doing lately. So this isn't all just based on what April is saying. The guardian in Lydon is saying, look, even with unsupervised visits that he's recently been getting, now he is doing things to this child that are contrary to the interests of the mother and daughter. He's saying things to her that's affecting their relationship, and she's acting out. Now, when you say that GAL is not necessary, first off, he violated the court order. She didn't ask for anything until then. She thought she had the security of the court order. When he violated that, that's when the guardian in Lydon got involved. This would be different. There's a case out there that says a person made baseless accusations, and a guardian in Lydon gets appointed, and after all this investigation finds that there's nothing to it. Everything that April was concerned about, the guardian in Lydon backed her up. She said it's the father who doesn't get it, the father who keeps saying things to the child, even today, which are harmful to this child. So her decision to request a guardian in Lydon was completely proper. He says it was just a phone call that pushed her over the edge. No, it was a violation of court order. She finally thought she had safety in a court order that Mr. Roy decided wasn't worth following. He says that April did not tell him about Children's Hospital. That's interesting because he testified that she went and took the child to Children's Hospital and didn't tell me, I didn't find out until she got home that night. But he also says that as soon as April left the house that afternoon, he went to his parents or to his mother's house and said, oh, April's taken Riley to Children's Hospital. Now, how can he tell his family that if she didn't tell him that she was taking the child to Children's Hospital? Just like his claim that she never returned any of his texts. It's in the record. I said, well, I asked you to produce all the texts and other messages that you sent to her and received back, and or received back. Did you produce anything to me? No. He says she never returns my phone call. And yet he talks about these phone calls that they have about lining up him having a child on Veterans Day, about him taking the, how she pressured him to take the daughter to Six Flags. Oh, as part of the attorney's fees, again, the case law out there, if you look at the superiority of the financial position of the parties, he is vastly superior. He historically makes three times what she does. He made his expenses are inflated. He has a living girlfriend who contributes $1,500 to $2,000 a month. He has virtually no debt. She has huge debt. He was awarded the bulk of the marital property. And therefore, under the case law, you could consider that disparity in income. The law says she doesn't have to be to the point where she has to give up everything she has to be able to pay her attorney's fees. Mr. Lee said, well, she's getting money from his retirement. Well, that's going to be, if she takes that money out, she gets hit with penalties and taxes. Again, this notion that all of the communication is her problem, that's just false. She does, she has tried to communicate with him. And every time she tries to communicate with him, you know, it's a slippery slope. Well, you let our daughter go off with your sister, and she took him home and faced her abuser again, and now our daughter has to go back into therapy. And then she gets a court order. No contact. He violates that. It's just a simple phone call. Well, you know what? What's going to happen next week, then, if she says nothing about it? Well, that's okay. I'll let that slide. Again, everything you look at here, every action taken by the mother has had one purpose, protect our daughter, whether it's getting the guardian ad litem, whether it's trying to work out the visitation. She's the only one who has been focused on that. That's why joint custody just cannot work, especially in light of the failure of the parties to communicate. And the testimony of the guardian ad litem, to this day, he's still saying things to her. Thank you, Counsel. We appreciate the briefs and arguments. Counsel will take the case under advisement, issue an order in due course. Thank you. Your Honor.